UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MAX EVANS and MARLENE EVANS,<br><br>Plaintiffs,<br><br>v.<br><br>WRIGHT MEDICAL TECHNOLOGY, INC.,<br>WRIGHT MEDICAL GROUP, N.V., and<br>WRIGHT MEDICAL GROUP, INC.,<br><br>Defendants. | CAUSE NO. 3:19-CV-00160-DRL-MGG |

OPINION AND ORDER

Max and Marlene Evans filed this product liability action over allegedly defective orthopedic hip devices implanted in Mr. Evans' left hip during his 2013 total hip arthroplasty. The Evans claim that Wright Medical Technology (WMT), Wright Medical Group, Inc. (WMG), and Wright Medical Group, N.V. (WMGNV) designed, marketed, sold, or distributed the PROFEMUR® hip implant devices that caused Mr. Evans' injury. WMT admits its involvement (ECF 8-1 ¶ 19), while WMG and WMGNV deny any part in the design, marketing, sales, or distribution of these devices. WMG and WMGNV filed motions to dismiss under Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction, and this case was thereafter reassigned to this presiding judge.

BACKGROUND

WMG, WMGNV, and WMT are all separate entities. ECF 1 ¶¶ 3-6; ECF 8-1. WMG is the parent holding company and only shareholder of WMT. ECF 8-1. WMGNV is a foreign corporation that formed in 2015 after a merger between Tornier, N.V. and WMG. *Id.* After the merger, WMG remained a separate entity from WMT and WMGNV, and WMG continues to operate as the holding

1

company of WMT. *Id.* The only difference is that, after the 2015 merger, WMG became an indirect subsidiary of WMGNV.

WMGNV has several additional indirect subsidiaries, including Tornier, Inc.—not to be confused with Tornier, N.V.—which leased a facility in Warsaw, Indiana. *Id.* After Tornier, Inc.'s initial lease ended, it moved its operations to Columbia City, Indiana, where Tornier, Inc.'s current products are manufactured. ECF 13-1 ¶¶ 5, 8.

WMG and WMT are Delaware corporations with their principal places of business in Tennessee. ECF 1. WMGNV is a foreign corporation from the Netherlands with its principal place of business in Tennessee. ECF 10-1.

WMG and WMGNV submitted three affidavits from Debby Daurer, WMT's Senior Manager of Legal. ECF 8-1, 10-1, and 13-1. In these affidavits, Ms. Daurer maintains WMT's corporate separateness from WMG and WMGNV. *Id.* Both WMG and WMGNV deny any involvement in designing, developing, manufacturing, selling, or distributing the hip implants at issue. *Id.*

In addition, regarding the facilities located in Indiana, Ms. Daurer says the Warsaw location was leased to Tornier, Inc. *Id.* The Evans do not dispute this, as they admit the same in their complaint. ECF 1 ¶ 13. Ms. Daurer asserts that Tornier, Inc. no longer leases the Warsaw location and has moved their operations to Columbia City (ECF 13-1), the location of the second facility the Evans claim belongs to WMG and/or WMGNV (ECF 12 at 6–7).

The Evans argue that WMG and WMGNV are subject to this court's jurisdiction because of two facilities located in Indiana—one in Warsaw, Indiana and the other in Columbia City, Indiana— that allegedly were or are currently operated by WMG and/or WMGNV. ECF 12 at 21. In addition, the Evans claim that WMG and WMGNV are the owners and designers of the hip implants at issue. *Id.* To prove these allegations, the Evans rely on press releases, Securities and Exchange Commission (SEC) filings, and information on public websites. ECF 12-2 to 12-25.

STANDARD

Under Fed. R. Civ. P. 12(b)(2), the plaintiff bears the burden of demonstrating jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). A party may submit, and a court may consider, materials outside the pleadings in determining jurisdiction. *Id.* The court may weigh affidavits, exhibits, or other evidence submitted by the parties, but the court must construe all facts concerning jurisdiction in the non-movant's favor. *See id.*; *Charlesworth v. Marco Mfg. Co.*, 878 F. Supp. 1196, 1199 (N.D. Ind. 1995). When a district court rules on a defendant's motion to dismiss based only on the submission of written materials, the plaintiff need only establish a *prima facie* case of personal jurisdiction. *Purdue,* 338 F.3d at 782.

DISCUSSION

The court has personal jurisdiction over a defendant to the same extent a state court in Indiana could exercise personal jurisdiction over that defendant. *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014). The court need not tarry on analyzing the reach of Indiana's longarm statute because it extends to the limits of federal due process. *See id.*; *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind. 2006) ("Indiana's long-arm provision now extends to the limits of the Constitution."). Instead, the court can proceed directly to the due process analysis. *Mobile Anesthesiologists Chi., LLC v. Anesthesia Associates of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). The court must determine whether exercising jurisdiction over WMG and WMGNV comports constitutionally with the limits of due process. *Advanced Tactical*, 751 F.3d at 800 (citing *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014)).

Under federal due process analysis, a defendant is subject to personal jurisdiction in a state only if the defendant had minimum contacts with the forum such that subjecting the defendant to suit does not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). Since the seminal decision in *International Shoe*, two types of

personal jurisdiction have developed: "general" (sometimes called "all-purpose") jurisdiction and "specific" (sometimes called "case-linked") jurisdiction. *Bristol-Myers Squibb Co. v. Superior Court,* 137 S. Ct. 1773, 1780 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown,* 564 U. S. 915, 919 (2011). The court addresses these two types of jurisdiction in turn.

A. Specific Jurisdiction

Specific jurisdiction over a defendant arises when a defendant "purposefully avails itself of the privilege of conducting activities with the forum state, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253 (1958). Specific jurisdiction is not based on the plaintiff's contacts with the forum state, but instead focuses on the defendant's contacts with the forum state. *Advanced Tactical,* 751 F.3d at 801. Additionally, for a court to exercise specific jurisdiction, the suit must arise out of the defendant's forum-related activity. *Id.* If the plaintiff fails to link the defendant's contacts with the forum state to the cause of action, specific jurisdiction is not proper. *Id.* ("To hold otherwise would mean that a plaintiff could bring suit in literally any state where the defendant shipped at least one item.")*; see also Calder v. Jones,* 465 U.S. 783 (1983).

To establish specific jurisdiction here, the Evans must show that WMG and WMGNV purposely availed themselves of Indiana law, notwithstanding WMT's admitted contacts with Indiana. *Keeton v. Hustler Magazine*, 465 U.S. 770, 781 n.13 (1984) ("jurisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him; nor does jurisdiction over a parent corporation automatically establish jurisdiction over a wholly owned subsidiary"). Moreover, the Evans must link WMG and WMGNV's alleged Indiana connections with the cause of action (*i.e.*, to the hip implants at issue). The Evans have not established either point.

WMGNV was not formed until 2015. ECF 1 ¶ 7; ECF 8-1 ¶ 10. A year prior, in January 2014, WMT sold the division that produced these hip implants to a third party. ECF 8-1 ¶ 19. Mr. Evans received his hip implant on July 17, 2013, six months *before* WMT sold the PROFEMUR hip division

and almost two years *before* WMGNV's formation. *Id.* These facts thus link WMT to this case jurisdictionally; but WMGNV could not have had any Indiana-related conduct specific to these hip implants before 2015, as the company did not yet exist. *See Advanced Tactical,* 751 F.3d at 801. This court does not then have specific personal jurisdiction over WMGNV.

Turning to WMG, the Evans argue this company was responsible for owning and designing PROFEMUR hip implants. WMG's affidavits and the Evans' admissions show that WMG did not purposefully avail itself of Indiana law. WMG did not design and distribute the hip implants at issue, and WMG did not own or operate an Indiana facility. *See* ECF 1, 8-1, 10-1, 12, 13-1. Ms. Daurer's affidavit establishes that Tornier, Inc. originally leased the Warsaw facility until it moved its operations to Columbia City. Even if those facilities could be linked somehow to WMG, the Evans have not tied this hip implant to either facility. *See Advanced Tactical,* 751 F.3d at 801.

To prove that WMG participated in designing and manufacturing the hip implants, the Evans introduce several SEC documents filed by WMG (ECF 12 at 11–16). The Evans argue that WMG, in its 2001 Form 10-K, took credit for the PROFEMUR hip system and that it was really WMG, not WMT, that owned and designed the PROFEMUR hip system. *Id.* at 12.

A section titled "Business" within the Form 10-K states that "Wright Medical Group, Inc. (the 'Company') is a global orthopaedic device company specializing in the design, manufacture and marketing of reconstructive joint devices and bio-orthopaedic materials." *Id.* at 11. Further, "[t]hrough the Company's acquisition of Cremascoli, several hip implant products designed for the European market, including the . . . PROFEMUR TM-R Hip System, were acquired." *Id.* The Evans focus on WMG's use of the word "Company" in the 2001 Form 10-K to show that WMG was the company, and not WMT, that owned the PROFEMUR products. *Id.*

In the same form, the Evans quote the "History" section: "The Company was incorporated on November 23, 1999, as a Delaware corporation (previously named Wright Acquisition Holdings,

5

Inc.) and had no operations until an investment group led by Warburg, Pincus Equity Partners, L.P. ("Warburg") acquired majority ownership of the Company's predecessor, Wright Medical Technology, Inc." *Id.* at 11–12. In other words, WMT became a subsidiary of WMG in 1999.

The Evans point to other SEC filings by WMG to argue that WMG designed and developed the PROFEMUR products. In a Form 10-Q filed with the SEC, WMG discusses pending litigation over certain products. ECF 12-24 at 43. Specifically, the form says "[w]e have received claims for personal injury against us associated with fractures of our PROFEMUR® long titanium modular neck product." *Id.* According to the Evans, "WMG had every opportunity to say that this litigation involved its subsidiary, Wright Medical Technology, Inc. [WMT], for which it ultimately had no legal liability or financial responsibility." ECF 12 at 14. Yet, "we," "us," and "our," as used in the Form 10-Q, refers globally to any WMG affiliate. In fact, this Form 10-Q discusses litigation-related inquiries with other subsidiaries owned by WMG. For example, the section right before the PROFEMUR litigation section, titled "Patent Litigation," discusses several other products sold by WMG affiliates. "In June 2013, Orthophoeniz filed a patent lawsuit against us in the United States District Court for the District of Delaware alleging that surgical methods using the X-REAM® product infringe two patents." ECF 12-24 at 42. Additionally, "[i]n June 2013, Anglefix filed suit in the United States District Court for the Western District of Tennessee alleging that our ORTHOLOC® products infringe Anglefix's asserted patent." *Id.* The 10-Q thus makes a consolidated disclosure of pending lawsuits or claims of interest to investors, not just with the parent company, but also its subsidiaries.

Also, in the Form 10-Q, WMG discloses that it sold its OrthoRecon operating segment, which manufactured hip and knee products, for $285 million to a Cayman Island corporation. ECF 12 at 15. "As a result of the transaction, we recognized approximately $24.3 million as the gain on disposal of the OrthoRecon business, before the effect of income taxes" ECF 12 at 15, 12-24 at 27. The Evans propose that, after the OrthoRecon business was sold, WMG left WMT with "the inability to satisfy

6

any judgments which may be rendered against it related to the defective design of its products." ECF 12 at 15. That proposition has not been established based solely on this statement. And again, for purposes of personal jurisdiction, this statement is not inconsistent with WMG's position that WMG was a holding and parent company of many companies. The title of this section explicitly states, "Notes to Condensed Consolidated Financial Statements," which means all transactions, whether merger, acquisition or sale, are reported on this SEC filing. ECF 12-24 at 26.

In the same Form 10-Q, WMG lists other transactions involving its subsidiaries. "On November 15, 2013, we acquired 100% of the outstanding equity shares of Biotech International (Biotech), a leading, privately held French orthopaedic extremities company . . . The transaction will significantly expand our direct sales channel in France and international distribution network and add Biotech's complementary extremity product portfolio to further accelerate growth opportunities in our global extremities business." *Id.* at 25. These transactions, including the $24.3 million gained from selling the OrthoRecon business, comport with the generally accepted practice of listing all transactions by WMG and its affiliates. *See* ECF 12-24 at 16 (under the title "Summary of Significant Accounting Policies," "[t]he accompanying unaudited condensed consolidated interim financial statements include our accounts and those of our domestic and international subsidiaries, all of which are wholly-owned subsidiaries").

These SEC filings illustrate nothing more than a parent-subsidiary relationship between WMT and WMG and the consolidated reporting of business activity. It is well-established that "the Internal Revenue Service, SEC, and generally accepted accounting principles, all allow parent companies to consolidate their financial activities with that of their subsidiary companies in their annual reports." *Miley v. Fleetwood Enterprises, Inc.,* 2005 WL 8165588, 4 (S.D. Ind. Oct. 6, 2005) (quoting *Corporate Safe Specialists, Inc. v. Tidel Techs., Inc.*, 2005 LEXIS 14414, 5 (N.D. Ill. July 15, 2005)); *Avery Dennison Corp. v. UCB SA*, 1997 LEXIS 11504, at 3 (N.D. Ill. July 30, 1997) ("consolidating the activities of a

subsidiary into the parent's annual reports is a common business practice [and] is allowed by both the Internal Revenue Service and the Securities and Exchange Commission, and it is recommended by generally accepted accounting principles") (quoting *Calvert v. Huckins*, 875 F.Supp. 674, 678 (E.D.Ca.1995) (citing *Lowell Staats Min. Co. v. Pioneer Uravan, Inc.,* 878 F.2d 1259, 1264 (10th Cir. 1989)); *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft,* 751 F.2d 117, 121 n. 3 (2d Cir. 1984). These SEC filings must be viewed as consolidated reports, describing the operations of not just WMG, but all its subsidiaries as well. Consequently, these SEC filings fail to establish WMG's control over the PROFEMUR hip implants and cannot be a basis for specific jurisdiction over WMG on this record.

The Evans also direct the court's attention to press releases issued by WMG between 2000 and 2013 (ECF 12 at 18–20) to demonstrate that WMG was the owner and designer of the PROFEMUR hip implants. In summary, the Evans argue that WMG made sufficient representations to the public that it was the owner and designer of the PROFEMUR hip products to subject WMG to Indiana's jurisdiction. ECF 12 at 18. For instance, one press release states: "Wright Medical Group, Inc. Introduces PROFEMUR Stem Total Hip System . . . The PROFEMUR Tapered Stem Total Hip System represents the latest enhancements to Wright's family of innovative hip solutions featuring modular neck technology." *Id.* at 18. Another one states: "As part of Wright's PROFEMUR® family of implants, the RENAISSANCE™ stem also incorporates modular neck technology which is ideally suited for a less invasive surgical approach." *Id.*

The Evans claim that these press releases show that WMG was the actual owner and designer of PROFEMUR products, but the press releases speak to the Wright "family." WMG acts as the holding company for several subsidiaries, including WMT, Wright Medical Europe, Wright Medical Australia PTY Limited, Wright Medical Deutschland GmbH, Wright Medical Italy, and Wright Medical Technology Canada. ECF 8-1 ¶ 7. With such a large global operation that sells many products through various subsidiaries, the ultimate parent (WMG) refers to PROFEMUR products, in several

8

press releases, as part of "Wright's family" of products. ECF 12 at 18. If anything, these press releases reaffirm a parent-subsidiary relationship, particularly on this record. *See, e.g., IDS Life Ins. Co. v. SunAmerica Life Ins. Co.,* 136 F.3d 537, 540 (7th Cir. 1998) ("Parents of wholly owned subsidiaries necessarily control, direct, and supervise the subsidiaries to some extent, but unless there is a basis for piercing the corporate veil and thus attributing the subsidiaries' torts to the parent, the parent is not liable for those torts."). The press releases fail to show that WMG, as the parent, substantially controlled WMT, the subsidiary; or that WMG actually designed, manufactured, or sold PROFEMUR products. While admittedly the title refers specifically to WMG, the generic use of "Wright family" within the text clarifies its focus on the Wright family of companies and products.

The other press releases that do not speak generically to "Wright" or "Wright's family" still fail to show how WMG controls the day-to-day activities of WMT. Instead, these press releases report on new designs or advancements in products. ECF 12 at 18. Similar to other courts, this court agrees that "[a]s with SEC disclosures, it is common and, in fact, expected for a parent entity to report upon events that materially impact a consolidated subsidiary. None of the statements in the press releases contradict the testimony in the Daurer Affidvait." *Marcovecchio v. Wright Med. Grp., Inc.,* No. 2:18-cv-274, 2019 U.S. Dist. LEXIS 54414 at 12 (D. Utah Mar. 28, 2019); *see also Moody v. Charming Shoppes of Delaware, Inc.,* No. C 07-6073, 2008 U.S. Dist. LEXIS 120585 at 18 (N.D. Cal. May 20, 2008).

This circuit has consistently rejected personal jurisdiction over a parent company based solely on its subsidiary's contacts. *See Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000) ("where corporate formalities are substantially observed and the parent does not dominate the subsidiary, a parent and a subsidiary are two separate entities and the acts of one cannot be attributed to the other"). Here, the Evans adduce no evidence to show how WMG dominated WMT; nor do they point to which corporate formalities were ignored. The court has before it no record that would justify piercing WMG's corporate veil.

When deciding the question of whether to pierce a company's corporate veil, the court looks to several factors: "(1) the failure to maintain adequate corporate records or to comply with corporate formalities, (2) the commingling of funds or assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation as its own." *Van Dorn Co. v. Future Chemical and Oil Corp.*, 753 F.2d 565, 570 (7th Cir.1985). These factors weigh against piercing WMG's veil here. In her affidavits, Ms. Daurer states that (1) WMG maintains separate accounting and banking records from WMT (ECF 8-1 at ¶ 14); (2) WMG is a holding company that has no employees (*Id.* at ¶ 8); and (3) "WMG's primary business purpose is to hold all convertible debt associated with the consolidated global operations of the operating subsidiaries for which it acts as a parent and, prior to the 2015 merger of WMG and Tornier, N.V., to hold all publicly traded capital stock associated with the same consolidated global operations."[1] (*Id.* at ¶ 10).

The press releases and SEC filings, while on their surface and without context, may appear at first blush to suggest WMG's connection to PROFEMUR hip implants; but they must be viewed in the context of the Wright family's corporate structure. *See Purdue Research Found.*, 338 F.3d at 788 n.17; *IDS Life Ins. Co.*, 136 F.3d at 540. In this case, the SEC filings describe a global operation, and the press releases may suggest certain supervision and direction, but not the type of control that would make WMT's conduct and contacts those of WMG. In short, this record is not supportive of corporate piercing.

Furthermore, the Evans have not shown how WMG's alleged Indiana-related conduct led to Mr. Evans' injury. *See Advanced Tactical,* 751 F.3d at 801. The Evans try to connect WMG to Indiana by alleging that "WMG keep[s] its engineering facility and research and development facility in Indiana, do[es] business in Indiana, and employ[s] Indiana residents." ECF 12 at 10. There can be no

---

[1] Because WMG has no employees, something not unusual given it remains a holding company, Ms. Daurer's affidavit as a WMT employee, particularly in her role as legal counsel to address the corporate family, is not inappropriate here.

valid argument that WMG operates an Indiana facility when the Evans admit in their complaint that "Tornier" operated the Warsaw, Indiana facility and not WMG or WMGNV. ECF 1 ¶¶ 13, 14. The Evans mistakenly allege that after WMG's merger with "Tornier," the Warsaw facility became owned by "Wright Medical." *Id.* Ms. Daurer clarifies that after Tornier, N.V. merged with WMG, Tornier, Inc. still leased the Warsaw facility. ECF 13-1 at 1 and 2. Tornier, Inc. is and was a separate entity from WMG.

The Evans also agree that the Columbia City facility was not built until 2018, which means even if WMG operated that facility, those Indiana connections could not have been related to Mr. Evans' 2013 injury. ECF 12 at 6. With that said, the Evans cannot establish that WMG maintained "meaningful" contacts with Indiana, nor can they tie those contacts to the injury. *Calder,* 465 U.S. at 789; *see e.g., Leibovitch v. Islamic Republic of Iran*, 852 F.3d 687, 690 (7th Cir. 2017) (court could not exercise personal jurisdiction over local branches of international bank for conduct unrelated to the forum and litigation-specific contacts). Even if WMG had such a facility in Indiana, there has been no showing that it is tied to this case for specific jurisdiction.

The Evans further argue that "[i]t is that 2001 're-designed' PROFEMUR modular neck and its predecessors that were distributed in Indiana, implanted in Indiana, and caused an injury to a citizen of Indiana. As the designer of that product, WMG is subject to the long arm jurisdiction of this court." ECF 12 at 13. Yet, injury to a forum resident does not alone constitute a sufficient connection to the forum. *See Walden,* 571 U.S. at 290. "The proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects him to the forum in a meaningful way." *Id.* (citing *Calder v. Jones*, 465 U.S. at 789). The Evans say the PROFEMUR products were distributed in Indiana and implanted in Indiana but do not substantiate facts to establish that Indiana-related contacts *by WMG* are case-linked to Mr. Evans' injury. *See Bristol-Myers Squibb Co.*, 137 S. Ct. at 1780. This court thus lacks specific personal jurisdiction over WMG.

11

B.  General Jurisdiction

The standard for general jurisdiction is more stringent than the standard for specific jurisdiction. *Kipp v. Ski Enter. Corp.*, 783 F.3d 695, 698 (7th Cir. 2015). A court has general jurisdiction when the defendant's affiliations with the forum state are so continuous and systematic as to render it essentially "at home" in the forum state. *BNSF Ry. v. Tyrrell,* 137 S.Ct. 1549, 1558–59 (2017); *Daimler AG v. Bauman,* 134 S.Ct. 746, 760–61 (2014); *Goodyear Dunlop Tires Opers., S.A. v. Brown,* 564 U.S. 915, 919 (2011). A defendant is subject to general jurisdiction where it is incorporated or has its principal place of business, unless there are exceptional circumstances. *Damler AG,* 134 S.Ct. at 760; *see also Perkins v. Benguet Consol. Mining Co.* 342 U.S. 437, 446–449 (1952) (Philippine corporation was subject to general jurisdiction in Ohio when it conducted its administrative and management activities exclusively from that state during the World War II period); *Abelesz v. OTP Bank,* 692 F.3d 638, 654-655 (7th Cir. 2012) (*Perkins* case is the best example of exceptional circumstances to subject defendant to general jurisdiction of forum state).

To establish general jurisdiction over WMG and WMGNV, the Evans have the burden of showing that WMG and WMGNV can be deemed at home in Indiana, but they have not met that burden. *Goodyear Dunlop Tires,* 564 U.S. at 919. First, the Evans have not shown that WMG or WMGNV operated or owned any facility or office in Indiana. Second, these corporate defendants have neither their home through incorporation or principal place of business in Indiana. *Damler AG,* 134 S.Ct. at 760. Third, the Evans have not argued, much less established an exceptional case on this record. *See Abelesz,* 692 F.3d at 654–655.

The Evans claim that WMG operates an engineering facility out of Warsaw, Indiana and Columbia City, Indiana, which subjects WMG to this court's general jurisdiction. To support this, the Evans cite WMG's website page titled "Worldwide Locations," press releases, and several public LinkedIn profiles. ECF 12 at 5-7.

Accepting the Evans' factual pleadings as true for purposes of a motion to dismiss, the Evans fail to make a *prima facie* case for this court's general jurisdiction over WMG and WMGNV. *Purdue Research Found.,* 338 F.3d at 782. The Evans have not established that WMG operates an engineering facility in Indiana, and indeed the evidence is to the contrary; nor have they established that such a facility would meet the paradigm examples for general jurisdiction. *See Damler AG,* 134 S.Ct. at 760. The Supreme Court has not held "that a corporation may be subject to general jurisdiction *only* in a forum where it is incorporated or has its principal place of business," *id.*, but, in extension, the Evans have not cogently explained how the alleged contacts meet the *Daimler* standard or an exceptional circumstance as espoused in *Perkins,* 342 U.S. at 446-449. *See also Abelesz,* 692 F.3d at 654-655.

The website—devoted to "Wright"—does list Indiana as the location of a Wright facility, but the website also lists over a dozen other nationwide sites within the Wright family. ECF 12-6. To that point, the website states that "™ and ® denote Trademarks and Registered Trademarks of Wright Medical Group N.V. *or its affiliates*. ©2018 Wright Medical Group N.V. *or its affiliates*." *Id.* at 8 (emphases added). The website's URL (http://www.wright.com) generically refers to Wright, not WMG or WMGNV, and "Wright" can apply to any of WMG or WMGNV's affiliates. The website, along with the public LinkedIn profiles in context, *see Tyrrell*, 137 S. Ct. at 1559 (2100 employees insufficient), do not establish that WMG or WMGNV has so continuous and systematic contacts in Indiana to make them essentially at home in this state. *Damler AG,* 134 S.Ct. at 761. For these reasons, this court lacks general jurisdiction over WMG and WMGNV.

What is more, federal due process contemplates fairness in the jurisdictional analysis, *Asahi Indus. Co.*, 480 U.S. at 114, and it would not comport with fundamental fairness to hail WMG or WMGNV into this state. WMGNV is a foreign corporation established under the laws of the Netherlands, and it would be unfair to require WMGNV to defend this case, even to respond to jurisdictional discovery, when the facts indicate this hip implant was designed, manufactured, and sold

13

before WMGNV existed as a company. *See id.* Furthermore, it is not forcefully contradicted with evidence that WMG acts as the parent and holding company of WMT. Subjecting WMG as a holding company to this court's jurisdiction based on a parent-subsidiary relationship alone would also be unfair and would disregard the corporate structure altogether. The court lacks jurisdiction over WMG and WMGNV accordingly.

    C.      Jurisdictional Discovery

The Evans ask the court to allow them to conduct limited discovery for the purposes of establishing personal jurisdiction over WMG and WMGNV. "As a general matter, discovery under the Federal Rules of Civil Procedure should be freely permitted, and this is no less true when discovery is directed to personal jurisdiction." *Andersen v. Sportmart, Inc.*, 179 F.R.D. 236, 241 (N.D. Ind. 1998) (quoting *Edmond v. United States Postal Service Gen. Counsel,* 949 F.2d 415, 428 (D.C. Cir. 1991). However, "a plaintiff does not enjoy an automatic right to discovery pertaining to personal jurisdiction in every case." *Id.* To obtain jurisdictional discovery, a plaintiff must make a *prima facie* case showing that personal jurisdiction over the defendant might exist. *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946 (7th Cir. 2000) (jurisdictional discovery was inappropriate where the plaintiff could not show that the nonresident defendant corporation exercised an unusually high degree of control over its subsidiary).

In this case, there is no meaningful dispute on the issue of general jurisdiction, or specific jurisdiction over WMGNV, and little on the issue of specific jurisdiction with respect to WMG once the alleged contacts have been properly assessed. The Evans have presented what their *prima facie* case of specific jurisdiction over WMG entails. While the court certainly is not calling this position based on the facilities, press releases, and SEC filings entirely without argument, it is not—based just on this record—of the level that justifies withholding ruling on this motion to dismiss to await further exploration into jurisdictional facts. *See Andersen*, 179 F.R.D. at 242; *see also Sullivan v. Sony Music Entm't*,

14

2014 LEXIS 152771, 5 (N.D. Ill. Oct. 28, 2014) ("jurisdictional discovery should be denied where a plaintiff's motion is based on bare, attenuated, or unsupported assertions of personal jurisdiction," or "where the defendant has provided affirmative evidence that refutes the plaintiff's assertion of jurisdiction").

The court appreciates that certain colleagues have proceeded with jurisdictional discovery in other cases involving the Wright companies, but an ultimate decision on personal jurisdiction was never made in those cases. *Fields v. Wright Med. Tech., Inc.,* 2016 U.S. Dist. LEXIS 187316 (N.D. Ind. June 24, 2016) (DeGuilio, J.); *Rush v. Wright Med. Tech.,* No. 4:16-cv-19, Dkt. No. 27 (N.D. Ind. Mar. 31, 2017) (Van Bokkelen, J.). In addition, *Fields* articulated some concerns with its record—for instance, while WMG denied operating an engineering facility in Indiana, it had not identified the entity that owned and operated the facility, thus posing questions but not delivering answers; that is not a concern in this court's record today. *Fields* also arguably lacked the record the court has today to understand the nature of the SEC filings, press releases, and website, and their consolidated nature. *Fields* may not then have been unwise to develop a more complete record first, even more so when it lacked the benefit of this circuit's elaboration on the stringent standard for general jurisdiction decided in *Daimler*, an issue *Fields* reserved until it had a full record. This court today stands on a clear record with the benefit of clear law. *See also Veljkovic v. Carlson Hotels, Inc.,* 857 F.3d 754, 756 (7th Cir. 2017); *Data Research and Handling, Inc. v. Vongphachanh,* 310 F. Supp. 3d 956, 962-63 (N.D. Ind. 2018).

Just by way of example to this point, suppose discovery happened to show that WMG actually had a research facility in Indiana, though the evidence refutes this claim. No evidence has established its tie to this particular claim, so specific jurisdiction would remain lacking. And general jurisdiction would not be meaningfully established by this one facility. For instance, *Tyrrell*, 137 S. Ct. at 1559, involved a railroad that had 2061 miles of railroad track, 2100 employees, with 1 of 24 automotive facilities located in Montana, and that was not so continuous and systematic to render the company

15

at home in that state. Thus, even if the Evans hoped to establish the contacts they think they could, it would not be sufficient. One facility is not enough—not for general jurisdiction. *See id.*; *see also Garcia v. LQ Properties, Inc.,* No. 2:15-cv-440, 2016 U.S. Dist. LEXIS 79694 at 9 (N.D. Ind. June 20, 2016) (finding seventeen hotels in Indiana insufficient to find defendant at home in Indiana).

The court must deny the request for jurisdictional discovery. Nevertheless, should discovery in the normal course of proceedings reveal additional evidence to warrant reconsideration of this view or personal jurisdiction over WMG or WMGNV, the Evans may timely seek leave to amend or join.

## CONCLUSION

Accordingly, the court GRANTS the motions to dismiss for lack of personal jurisdiction over WMG and WMGNV (ECF 7 and 9).

SO ORDERED.

October 21, 2019                     *s/ Damon R. Leichty*
                                     Judge, United States District Court